of America. I'm told all the lawyers are here, so we have a lot of 25 minutes per side. Judges are interested, we may go a little over, but that's the plan. I understand, Mr. Kassam, that you've reserved five minutes for rebuttal, is that right? All right, so we have a chance to get all these notices out, and then we'll proceed in just a moment. Good afternoon, Your Honor, and may it please the Court. A competent defense lawyer in 2006 representing a client he knows to be a naturalized U.S. citizen who is facing serious charges stemming from years-old conduct should, at a constitutional minimum, alert his client to the possibility that pleading guilty to pre-naturalization conduct could lead to deportation. Because Abdur Rahman Farhane's defense lawyer never warned him about the deportation risk, the straightforward application of Padilla and Strickland should bring this Court to vacate Mr. Farhane's guilty plea and conviction. The Court could also follow Padilla's reasoning to find that the distinction between collateral and direct consequences is as ill-suited to denaturalization as it is to deportation. A ruling in Mr. Farhane's favor here would impose only a minimal burden on defense lawyers because it is not very different from what they already do. And because there are fewer denaturalization cases than deportation cases, the ruling would only be relevant to a comparatively small number of cases. At the same time, the impact of denaturalization and deportation on clients and their families could not be more severe. In other words, the cost is low and the benefit high to defendants and to the integrity of proceedings. By contrast, the implication of the district court's ruling below and of the government's position here would be absurd. There is no dispute that had Mr. Farhane been a lawful permanent resident instead of a naturalized U.S. citizen at the time he pled guilty in 2006, then his defense lawyer's failure to advise him of the deportation risk would have been deficient under the Sixth Amendment. The government has already conceded as much. Mr. Farhane essentially would be penalized for going through the arduous... But there are different risks, right? Your Honor, there are different risks, but there are both particularly severe immigration consequences, and there are the only two severe immigration consequences that have been likened by the Supreme Court. There are many collateral consequences. There are many severe consequences. That is correct, Your Honor. Sex offender registration, being stripped of all of your assets, and forfeiture, all those things. Of course, Your Honor. All of those other collateral consequences that you have named, the law is well settled. With respect to denaturalization and deportation, those are the only two that the Supreme Court has mentioned in a single press as being the equivalent of banishment, exile, the loss of all that makes living life. They've never reached a decision on collateral versus direct as far as denaturalization is concerned. That's what we're doing here. Your Honor, this court could simply apply Padilla. Mr. Farhane was not warned about the deportation risk at play in the plea that he was advised to take. So I've looked at all the various documents that you've supplied in terms of what the standards were back in 2006. Now, we're talking now about the current situation in 2017, but looking back at those consequences and the standards that existed at that time, particularly with the ADA, there's a long list of collateral consequences that they think would be a good idea for the lawyers to advise their clients on. They're considered collateral there. They're using the term collateral.  But nowhere is there a reference to warning a U.S. citizen about the possibility of denaturalization and the possibility of deportation. There's all sorts of references to doing that with respect to a person who is an immigrant, whose behavior in the country, and that's sort of standard practice then for the ADA to have those standards, but never for a citizen. So I'm wondering about two things. First of all, we know that this was a very rare occurrence, and secondly, the standards really didn't apply to this kind of a situation. And if the ADA couldn't come up with a reason to give a warning to a potential person pleading guilty, how could it be reasonable for a client's lawyer to do it? Your Honor, if you'll allow me two points. On the denaturalization point, the very treatise that the Supreme Court cited in Padilla, the 2003 edition of Toobie, mentioned denaturalization risk stemming from post-naturalization pleas to pre-naturalization conduct, and it cites cases that mirror what is happening to Mr. Farhan today. So denaturalization was not an unknown risk. That was a resource that was mentioned in Padilla. The New York State Defenders Association... Your Honor, the prevailing professional norms are the expectations and practice of the legal community. That's what the Supreme Court said in Padilla. And so I had Mr. Farhan's trial counsel... The consequence of immigration and criminal law is so unusual that the characterization of something as collaborative or direct doesn't work in that case. Your Honor, correct. And she was quite clear in saying this was new ground, this was brand new ground, and that the norms of practice don't become relevant in understanding or evaluating prejudice or performance until after one understands that there's a constitutional premise of effective assistance and counseling working within the relationship, the relationship between the lawyer and the individual being represented, the individual who's charged with a crime and perhaps facing deportation. The person charged with a crime, and I presume you would say, facing denaturalization. Correct? Your Honor, again, our position is that Mr. Farhan faced a risk of deportation about which he was not warned by his trial counsel. So under a straightforward application of Padilla... Padilla established that relationship, not the ADA. Well, Your Honor, Padilla, in Section 2 of the opinion in Padilla... The fact that a good lawyer, the fact that a really good lawyer might think about that doesn't define the parameters of the Sixth Amendment of protection. Your Honor, what the Supreme Court held in Padilla, looking back to as early as 1995, that advice about the deportation consequence was part of the prevailing professional norms, at least going back to 1995. The court in Chavez actually dated it back to 1968. What the court did in Padilla was that it decided, based on the severity, the particular severity of deportation and the intimate relation that it bears to the criminal justice process... It's fairly automatic and practically inevitable if he's convicted that he's going to be deported. Isn't it different here? So in Padilla, the conviction itself makes him deportable, right? Whereas here, the conviction is neither necessary nor sufficient for the denaturalization in proceeding, right? Isn't it right that, you know, we could vacate Mr. Farhan's conviction and the government could still pursue the denaturalization by introducing all the evidence that he committed the crime and therefore had a bad moral character or misrepresented something willfully in the immigration proceeding? Or the conviction could stand and you could still argue against denaturalization, the ground that it wasn't willful or knowing or that there's some insinuating circumstances that made him have a good moral character, right? So it's not as automatic as the deportation consequence in Padilla, right? Well, Judge Menashe, the denaturalization and deportation consequences at play here are automatic. They may be different from the exact mechanisms that were at play in Padilla. On that, didn't it take the government 12 years to bring the denaturalization proceeding and they didn't bring it until after? It seems like they decided to do it much later on. Well, Your Honor, the passage of time is irrelevant to the Padilla analysis. There are many pure deportation cases where removal proceedings are not initiated for an extensive period of time as well. The important thing here is that though the links in the chain may be lengthier or more numerous in this particular case, Padilla actually accounts for that. Padilla says where the law is clear, as it is in Padilla, clear advice is owed. And where the law is less clear, where there's some attenuation, there's more complexity to the legal risk analysis, then counsel must still say something. And here, Mr. Farhan, who's owed advice about both denaturalization and deportation, importantly, was told nothing. You're saying Padilla says that where there's an attenuated risk, counsel still needs to say something? Exactly, Your Honor. It's really important that Padilla says they're creating an exception to the normal collateral distinction because of the nearly automatic consequence. Well, Your Honor, the Supreme Court in Padilla accounted for a range of complexity in legal analysis. And so when it comes to immigration, because immigration law is complicated, sometimes the causal chain may be longer, more complex, more obscure. And in those circumstances, trial counsel must still say something. Lack of clarity in the law, the Supreme Court said in Padilla, does not obviate the... And not just lack of clarity, doesn't Padilla say unclear and uncertain? That is correct, Your Honor. Can it be uncertain and automatic at the same time? Absolutely, Your Honor. I mean, you could take the example of Mr. Farhan's case. His lawyer advised him to plead guilty to a pre-naturalization aggravated solemnity. Now, that aggravated solemnity automatically disqualifies him from naturalization, subjects him to denaturalization. And the same aggravated solemnity, once he is denaturalized, will make him automatically deportable. So when you look at the lead count in the denaturalization complaint in the Eastern District, the legal procurement count, that count is made out automatically by the aggravated solemnity that went unwarranted. But that's not a function of whether there's a conviction, right? It's a function of facts and questions go back to the early period, 2002 to 2001. And those facts exist today, they existed then. That was what triggered the initial civil denaturalization proceeding. And it was filed. Now, the criminal case comes along, and then all you get is all the government's advantage there is they get a collateral estoppel on the facts that we admitted to. It's just an evidential point that's made. It could be proven all sorts of different ways in civil denaturalization with or without a criminal conviction. This case is not a case about collateral estoppel. It's about the legal effect of the conviction and whether a person in Mr. Fronsky's It's not the legal effect of the conviction beyond collateral estoppel. It's just basically telling Garfarin that he has no, you can't gainsay what the government is saying he did back in 2009, 2001 and 2002. Well, let me try to get at the question a different way. Collateral estoppel is also a play in removal proceedings, and removal can also be established based on conduct and not a conviction. So the fact that you can establish denaturalization or deportation based on conduct or conviction doesn't resolve the issue here. And isn't it correct that there was no civil denaturalization proceeding that was instituted as a result of the conduct, although the government was fully aware of the conduct because there was a confidential informant involved. Absolutely, Your Honor. It was only after the criminal proceedings on the false statements and the conspiracy count and after he had served his term, a year after finishing his term of 10 plus years, 13 years, that is when the civil denaturalization began. Absolutely, Your Honor. It was only after Mr. Frahan had served 11 out of 13 years and been released on good conduct a year after his relief was when the denaturalization proceedings were initiated. And in fact, your side prevailed on this particular point, leaving out our side, in effect, the assistance of counsel. Stripping of conduct. That the government is free to proceed with civil denaturalization, it just couldn't use the contents of the guilty plea. Your Honor, the fact that the government may proceed with an entirely different civil denaturalization case is neither here nor there. It's the same case as it started. Well, Your Honor, but it's neither here nor there for purposes of the Padilla analysis. The Padilla analysis is about the advice that is owed when there is a risk of a particularly severe immigration consequence. But here, it's automatic. Those are the two points that were discussed, right? That is correct, Your Honor. And on the automatic point, again, here, one need only look to the nature of the conviction. It is an aggravated felony conviction that predates Mr. Frahan's denaturalization. You're saying it's automatic after he's been denaturalized. The point is denaturalization is not automatic. Well, Your Honor, neither is deportation. So the Padilla analysis— No, no, but the point is that the immigration law has required that certain convictions mean automatic deportation, right? Right, Your Honor, but automatic— There may be discretion and there may be slip-ups, but the point is that statutorily, it is required. That is the result of the conviction. Your Honor, the— Could I actually ask you to clarify that? Is it deportable that you become or you become deported? You automatically get served and— You become deportable, Your Honor, and as this court well knows from reviewing numerous immigration cases that linger on the dockets endlessly, the initiation of removal proceedings or denaturalization proceedings is not immediate. That is an act of executive discretion, and that may happen immediately or it may happen 10 years into the future. Once it happens is where the Padilla analysis kicks in. That's where the word automatic gains its meaning. In other words, when Padilla speaks of an automatic consequence, it is not speaking about the initiation of removal or denaturalization proceedings. It is talking about what happens legally, what is the legal risk once those proceedings are initiated, and you can take the conviction at issue in Padilla itself. That was a 2001 conviction. Mr. Padilla was not in removal proceedings for that conviction. You're saying even if denaturalization were extraordinarily rare, which I guess it is, but it's even more extraordinarily rare, if there's one denaturalization every hundred years, we shouldn't think about what they say in Padilla about how it's automatic and how our practice is that many people are just automatically deported after committing a crime. We should only think about the automatic nature of it once that proceeding is brought. Even if it was unheard of that people were denaturalized. That's correct, Your Honor. Well, denaturalization was not unheard of, and we can talk about, you know, expensive— Even if it is unheard of, even if it almost never happens, Padilla still covers it because the language of that automatic only applies once the government decides to bring it. Your Honor, the Padilla analysis does not turn on trial counsel's assessment of the odds of a particularly severe immigration consequence, whether it's some form of deportation or denaturalization, and it doesn't turn on even the court's assessment of the probability of that particularly severe immigration consequence. It really turns on whether the legal risk is present. Padilla repeatedly talks about a risk of deportation and how advice is owed. Now, again, where the law is clear as it was in Padilla, where the legal consequence is clear and the causal chain is relatively short, then clear advice is owed, but Padilla itself says— Padilla says carries the risk, carries the risk of deportation. It doesn't say that carries the risk of an automatic deportation. That's correct, Your Honor. That's imminent, right? That's correct, Your Honor. The Supreme Court relied on the lack of imminence. Given the amount of discretion and the delay, how helpful is the term automatic in any of this as a practical matter? I mean, we're not talking about mathematical certainty in any context. Is that correct? That's absolutely correct, Justice Perez. And, again, that's the point I was trying to make earlier about the meaning of the term automatic. It does not mean imminent. It does not mean immediate. Clearly in the Padilla analysis, it is about the risk assessment. It's not about practical risk. It's about legal risk. And so once removal proceedings are initiated, once denaturalization proceedings are initiated, how automatic is the particularly severe immigration consequence? And I just want to be clear on one point. It doesn't require everyone to lose. It just means the mind-run of cases will result in deportation or denaturalization. Why would the mind-run of cases involving denaturalization automatically end in denaturalization? Because I thought you had to prove, if you're the government, not just that the crime was committed, but that it was willfully concealed or misrepresented. I mean, isn't this a lot like, I don't know if you're familiar with, Rahafe, which is the felon in possession statute, where now not only does the government need to prove that you were a felon in possession of a gun, but that you knew you were a felon. So you have an additional mental state. So you have to prove, if you're the government, not just that a crime was committed, but that you knew what you did was a crime, which in criminal mens rea terms usually would refer to willfulness, which is generally not an element of crime, and I believe is not an element of crime to which your client pled guilty. You know, that's a big hurdle, and we reversed plenty of criminal cases where the government has not made that showing. Your Honor, in this case, one need only take a look at the denaturalization complaint that the government filed in the Eastern District of New York in the supporting affidavit by a special agent, the affidavit of the cause. That denaturalization complaint repeatedly references the conviction, the guilty plea, so does the affidavit, and that's with respect to all three denaturalization counts. But it wasn't necessary to do that for him to get denaturalized, was it? I mean, you could bring a denaturalization proceeding independently of criminal. Your Honor, you are correct, but you can also bring a removal proceeding based on conduct, and if, for example, in a criminal proceeding, a client is not advised about pleading to conduct, not a conviction, conduct, that makes them removable, then that conviction, that plea itself, can be vacated subject under Padilla, and we've cited cases to that effect. There are cases we haven't cited, like People v. Saunders here in New York in 2021, where, again, it is a conduct-based ground of removal that was admitted as part of a plea process that was vacated because the plea was unadvised as to the removal consequence of the conduct. Just going back to civil denaturalization, you could bring a civil denaturalization based upon a poor moral character that had nothing to do with a conviction. It wouldn't have to be a conviction at all. You just go back and you put on the recordings and that's the poor moral character, and then he can try and defend himself if he wants to on that, but I'm seeing two different proceedings that are really unrelated to one another, except for the fact that they converge only at the point of his conviction in the sense of how it might be used in a civil denaturalization case, but a civil denaturalization can be achieved without the conviction. The conviction is not necessary for it, and yes, the government can rely on it in the sense that it gets the effect of allowing it to stop. Well, Your Honor, I guess the short answer is if you are facing denaturalization or deportation based on conduct without a conviction, then you wouldn't have an ineffective assistance to the counsel claim in relation to the criminal justice process. We are here today because Mr. Farhan was not advised about the deportation consequences. Could Mr. Farhan, I presume Mr. Farhan loses his citizenship and is now lying about his denaturalization application, because that's one of the things that must occur here. And the application is taking his citizenship away, so it's not premise on his conviction, correct? It's not saying you're to lose your citizenship because of your conviction. Your Honor, the affidavit in support of the first count cites the conspiracy to commit the crime of money laundering. That is the actual crime of conviction. The legal procurement of the lead count, and if you look at the other counts. The legal procurement is on the lack of good moral character, right? And that includes whether you committed a crime. But even if he's convicted, you could also argue there was extenuating circumstances Well, Your Honor, we aren't aware of any defenses to this. Let me ask you this again. In the statute that defines what the qualifications or the conditions are to denaturalize someone, is the conviction of this crime mentioned? Your Honor, the... It's not. No, actually, Your Honor, if I can... So you assume that it means that it's denaturalized. It's not because of his conviction, is it? No, Your Honor, it is because of the conviction. Presume that he's denaturalized, but he's still convicted. What happens to him? Your Honor, so if he is denaturalized and the conviction stands, then he is automatically deportable because it's an aggravated felony that was committed pre-naturalization. So the conviction speaks to his deportability in terms of it. Because under the immigration law, a conviction for a crime of moral turpitude or an aggravated felony in which this constitutes an aggravated felony becomes the grounds upon which he is deported. Is that correct? So, Your Honor, this conviction for an aggravated felony automatically disqualifies him for naturalization. That's by operation of law. And so it subjects him to denaturalization, again, by operation of law. And it's the same conviction that makes him deportable. And so our point is, since there is a deportation consequence, however remote, he was owed advice about it. My only suggestion to you is that this doesn't seem to me to be Padilla, but it does seem to me to be Padilla-plus. In the sense that his conviction does bear a strong relationship to his immigration status once his immigration status becomes relevant. Your Honor, so it is Padilla, again, to the extent that Padilla anticipates scenarios like this where the law is not succinct, not as straightforward as it was in Padilla, where the causal chain may be lengthier. Well, that's what I'm suggesting is, doesn't it just seem like it's an extension of Padilla, then? Giving him relief requires us to take Padilla a step further than Padilla did. Because Padilla simply talks about, Padilla is talking about what the Sixth Amendment protections are for a person who's in immigration status who's charged with a crime. This is a naturalized citizen who's charged with a crime. What are the Sixth Amendment protections? What are the obligations of policy with regard to making sure that there's Sixth Amendment protections, that the Sixth Amendment protections are proper? Well, Your Honor, our view is that what counsel did here, counsel, I mean, it's undisputed that counsel knew that he was representing a naturalized citizen facing very serious charges stemming from years-old conduct. And so, it's not a leap to infer that counsel knew  Mr. Fajardzadeh. It was decided in 2010, only two states in the entire country, New York being one of them, I have it, only two states in the country imposed effective assistance to counsel obligation upon an attorney representing someone in the criminal proceeding to appreciate the immigration ramifications of a conviction. No circuit in the country recognized such obligation. So, the fact that there may be good lawyers doesn't mean that bad lawyers are unconstitutional. Bad lawyers in the sense that lawyers not as good or as well-armed with regard to their responsibilities are acting as unconstitutional. Well, Your Honor, we can only apply Padilla. And what Padilla did was, it acknowledged your point, Your Honor, but then it looked to prevailing professional norms as reflected by the practice and expectations of the legal community. And it noted that at least as early as 1995, lawyers were being instructed to advise on deportation consequences. The Supreme Court in Chiang Kai-shek brought that back to 19... One of the norms that you have cited prior to that 2005 dealt with non-citizens and is in the context of non-citizens and immigration consequences that might flow from that. Your Honor, again... The inspirational points that you... Again, Your Honor, a treatise that the Supreme Court cited in Padilla, the 2B, 2003 edition, talks specifically about denaturalization risk. The New York State Defenders Association deportation 101 resource, which, by the way, is not just a resource, it's a reflection of the curriculum on which defense lawyers were trained at the time, that warned about denaturalization risks. And had Mr. Farhan's trial counsel just picked up the phone and called the Immigrant Defense Project hotline, what they would have said to him was, beware of the denaturalization and deportation risk in this sort of case because you are advising your client to plead guilty to conduct alleged to have occurred when he was still a non-citizen. Well, how do you explain the fact that, in 1999, the ABA came up with the standards that you cite and that you rely on very heavily about what to do with all of these various consequences? And not once in there is there any reference to denaturalization as a predicate to deportation as something that needs to be warned about. After they listed everything else, my question is, and this goes really to the Strickland point, how can it be unreasonable for counsel not to warn under those circumstances when the ABA, after studying and doing all the research and everything they could to come up with every conceivable possibility, didn't think of denaturalization as a predicate to deportation as a warning to the client? Well, Your Honor, even if we concede that denaturalization is more rare than deportation, it was not unknown. Your Honor, you have multiple Supreme Court cases. You have Cundis, Federico, Costello. You have Second Circuit cases, Reimer, Rossi, Otto, Asher. And you have a case that comes out and that's widely reported one year before Mr. Farhan's plea, Jean-Baptiste, which matches the exact same scenario at play here today with denaturalization. So the risk was not unknown. We found 87 denaturalization cases. If there's a risk, if there's a risk of harm, serious harm, then you're saying that under those circumstances there should be a constitutional protection. Absolutely, Your Honor. If you say that, if you say that, I want to know what the limiting principle is because of thousands of different consequences. Loss of permits, loss of, you know, I mentioned it already. Some of the, you know, sexual offender registration, things are very serious. You know, Your Honor, the law is well-settled with respect to all of these other collateral consequences that you have named. Denaturalization and deportation are the only particularly severe immigration consequences that the Supreme Court has mentioned in one breath. I mean, I do think it's worth exploring what are the limits if we adopt your view in the Sixth Amendment. I mean, the one that keeps coming to mind for me is, well, what about extradition? Natural born citizens who plead guilty to a crime in the United States but it's a cross-border crime, so they have to be advised that maybe they could be extradited to a different country and face prosecution and imprisonment there? Your Honor, our conception is far more modest. You know, if you have a defense lawyer But why wouldn't that be just as severe and why wouldn't it be something that would matter to a criminal defendant? Your Honor, so the reason the Supreme Court equated denaturalization and deportation is because they are the equivalent of losing everything that makes life worth living. They are the equivalent of banishment or exile. The Supreme Court has not said that about any of these other collateral consequences. Well, in a Dominican jail, that's the same as banishment as well, I imagine. Your Honor, I was only talking, though, about what is the scope of Padilla and Padilla focused on the increased risk of deportation and being banished in essence from this country. Losing one's citizenship, but deportation in particular. And just applying the language of Padilla, there's the core loss of citizenship that was automatic, as well as even when the circumstances and the consequences are somewhat less automatic or harder to know from an immigration law perspective what they will be. But I don't think we have to jettison the direct collateral distinction wholesale in order to look at Padilla as applicable to the increased risk subjected, that Mr. Farhan has suggested to, in these circumstances. Do you think we have to go further than that? Absolutely not, Judge Carney. In fact, again, this court could rule in Mr. Farhan's favor in one of two ways. One would be, again, a direct application of Padilla because he was not advised about the deportation risk. The other pathway would be to apply Padilla's logic to follow the steps in Padilla and reach the conclusion that denaturalization like deportation is ill-suited to the direct collateral framework. But then we would need to apply Strickland and then we have to look at what were the prevailing standards at the time, right? And we would have to look and see if he had shown prejudice. That's correct, Your Honor. So we just have to get past the initial is this a Sixth Amendment problem or is it not? Correct, Your Honor. And then apply to Strickland, right? Correct, Your Honor. And once you get to Strickland, you know, Mr. Padilla has met the standard for prejudice that applies under the J. Lee case from 2017. There's no dispute that he was prejudiced. There's really... I have a question about fatigue. I understand your argument about that we're just applying Padilla so it's not a new rule but the standard is that the result has to be so dictated by precedent that I guess reasonable jurists couldn't disagree.     We're all here today so how is this not a new rule that applies under the J. Lee case from 2017? Correct, Your Honor. And then there's a standard that's not a new rule barred by fatigue. Your Honor, setting aside our arguments on sort of forfeiture and to respond to your question, our contention is that this is merely the application of the principle that governed a prior decision, Padilla, to a different set of facts and Tietan Chai does recognize that.  of Padilla is so clear that reasonable jurists couldn't disagree about it? Your Honor, the application of Padilla cannot be that you are entitled to advice about particularly severe immigration consequences such as deportation unless you naturalize at some point in the future. If the conduct occurred when you were a noncitizen then you should be just as entitled to the Sixth Amendment  regardless of what happened to you subsequently. But Padilla did not involve a U.S. citizen. Correct, Your Honor. And there's no mention in Padilla of denaturalization as a predicate to deportation. In so many words. And that's why, Your Honor, again, citing Chai as looking at Tietan closely, we are saying this is a rule of general application that was meant to apply to myriad factual contexts and this is a different factual context. We get to the deportation consequence here through a different pathway. Rule of general application and part of the general application is that the collateral direct extinction is not helpful, should not be used. Then you're saying basically something a little different from what Judge Carney said that you've overseen has decided on the basis of case-by-case method, case-by-case analysis of each case of whether the consequence is captured or not by the Sixth Amendment. No, Your Honor. We're not saying this is a case-by-case. We're merely saying apply Padilla. Padilla is about the legal effect of a conviction, the legal risk in a particular plea process. Here, there was risk of a particularly severe immigration consequence to in fact Mr. Fahimi as well. But Padilla has repeatedly and repeatedly called Padilla to be non-citizen. And you are sort of asking us to ignore that and say that it really means something much broader. No, Your Honor. Padilla was focused on deportation risk. It talked about risk of deportation. No, it says non-citizen. It does say non-citizen, Your Honor, but that's because that is the class that normally deportation risk applies to. But this is also an easily identifiable class of people to whom deportation risk would also apply. So again, what we're saying is not very different from what lawyers are doing already. We're only asking them to really ask one more question if we're talking about trial counsel in Mr. Farhan's case, which is when were you naturalized? When did you become a U.S. citizen? What we know in this case it was obvious trial counsel knew as early as the first hearing that he was dealing with somebody charged with years-old conduct. Isn't that asking lawyers to provide a different kind of advice? So in Chávez we know that Padilla announces a new rule because you asked this perfect question about whether this amendment even applies. And you're saying we're asking lawyers to ask an additional question. When were you denaturalized? And so can I evaluate the possible denaturalization consequences of your plea? Don't we have to answer the question so this amendment applies to that? Yes, Your Honor. And again, the way you're asking the same extra thing here that the Supreme Court said was the extra thing that made it a new rule in Padilla. Right? Your Honor, the new move in Padilla as recognized by Chávez and Chávez is the recognition that deportation is ill-suited to the direct collateral framework. Now, Padilla did that work as Chávez recognized. And Mr. Farhan is entitled to invoke that rule. Is denaturalization the equivalent of that or something different? Because we've been talking about the distinctions between a denaturalization proceeding and just a deportation of an uncivilized person. Well, Your Honor, again, just to be clear, one way to rule in Mr. Farhan's favor is to say some deportation risk here went unwarned. Another way to rule in his favor is to follow the logic of Padilla and to deem the denaturalization That second option would be announcing a new rule. No, Your Honor, it would not. It would just be the application of Padilla's analysis. There's two ways. The first one is just the application of Padilla. The second one is to apply the logic to denaturalization proceedings. Section 2 of Padilla is a part of the opinion. Mr. Farhan can invoke any part of the majority opinion in Padilla because his conviction became final after Padilla. And so, he can invoke the analysis in Section 2 and applying that analysis should lead this Court to the conclusion that the direct collateral framework is as ill-suited. It's not a new rule because we're applying the same logic. You're applying the analysis which, you know, the Supreme Court in China has recognized was the new move in Padilla. It was the analysis in Section 2 of the Padilla opinion. Padilla involved a legal permanent resident, I think, right? Correct, Your Honor. Presumably, it would apply to other kinds of deportable aliens even if that meant an extra question to be asked by counsel to figure out what the level of risk was and the like. Correct, Your Honor. And it has been applied that way for folks who are non-lawful permanent residents. And for Mr. Farhan, again, our view is that trial counsel knew or should have known that they were advising him to plead guilty to pre-naturalization conduct. And if trial counsel did not know, then it was unreasonable not to ask the question knowing everything that trial counsel knew it was unreasonable not to ask the question, well, when did you become a U.S. citizen? Because that would have given trial counsel all the information trial counsel needed to figure out that they were advising Mr. Farhan to plead guilty to conduct that was alleged to have occurred when he was still a non-citizen occasioning particularly severe immigration consequences. Here, it's denaturalization and deportation. So, the causal chain may, there may be more links in the causal chain, but there is still a risk of deportation that went unwarned. And so, Mr. Farhan... Why didn't the record tell us about the prejudice question that even if he were so advised, he would have risked a 30-year sentence and not accepted the plea? Your Honor, he would not have been risking a 30-year sentence. So, let's imagine he had gone for trial. He would have faced 23 years. Now, we've looked at... Your Honor, let me finish the point. He would have been sentenced in all likelihood concurrently, not consecutively, severe. One of his co-defendants was sentenced five years below the maximum. He would have been capped at 15 years. That's a two-year delta between the 13 years he got through the plea and the 15 years he would have been facing a trial. That's the exact same difference in Jay Lee. And in Jay Lee, the Supreme Court said, Mr. Lee had no real defense at all. And the fact that it was a two-year difference between what he got... But in Lee, Mr. Lee kept asking about deportation consequences all the time. Like, he was asking his lawyer all the time. Is there something like that in the record here? Well, Your Honor, that's simply because Mr. Farhan should not be faulted for a second time for his counsel's ineffective assistance. It's exactly what the panel of this court recognized in Rodriguez. If you're not aware of the deportation risk, you shouldn't be expected to talk about it, but there's plenty of contemporaneous evidence in the record similar to Lee, Your Honor, in terms of... And similar to cases like Rodriguez in this circuit, in terms of Mr. Farhan's tenure in this country, how long he was here, the fact that he is the father to six U.S. citizen children and grandchildren, the fact that he was a business owner, the sole breadwinner. All of these facts by themselves, again, with respect to Mr. Lee who had no real defense, were deemed enough as a matter of law to make up... ...that were admitted at his trial where he says, we shouldn't think that this is our country, we shouldn't stay here in the long term, right? I mean, doesn't the record suggest that actually it wasn't a priority to say that? Well, Your Honor, this court should not credit unsworn, you know, casual remarks. The recordings that you're referencing, Your Honor, the recordings that you're referencing were recordings that were made by Muhammad Al-Ansi, an informant, who this court found had severely damaged credibility. Now, what Mr. Farhan would have done had he been advised about the deportation and denaturalization consequences, is he would have called Mr. Al-Ansi the same as the El Moya defendants did. He would have exposed him and his lack of credibility. Mr. Al-Ansi attempted to self-immolate in front of the White House. All of this was known at the time of Mr. Farhan's plea. Had Mr. Farhan been advised... Your Honor, the recordings are not genuine. Your Honor, our argument is that he had a viable defense and frankly, under the Lee standard, he doesn't even need any... The defendant is what? The person who made the recordings? Is unreliable. He had an entrapment defense. We don't even have complete recordings, Your Honor. The trial counsel noted that there were conversations that went unrecorded. There were conversations that were cut short. All of that is in the record before this court. That's more than enough. There is a surfeit of evidence here to make out the prejudice standard in Lee. The prejudice standard in Lee, the bar is actually very low compared to what we have in this case. In Lee, he had no real defense at all. He had deep U.S. ties. Mr. Farhan had real defenses and the same U.S. ties and he is a U.S. citizen. He has more to lose than Mr. Lee. Mr. Lee was a lawful permanent resident. So the... So isn't it the case that Mr. Lee had reason to be asking repeatedly about whether he was vulnerable to losing his citizenship whereas Mr. Farhan had no reason? In fact, many people who are naturalized citizens think it's permanent. It can't be undone. Absolutely, Your Honor. Mr. Lee was a lawful permanent resident so he had reason to ask those questions. Mr. Farhan felt safe and was relying on counsel. It was counsel's job. The onus was on counsel to advise Mr. Farhan about the denaturalization and deportation risks here. Mr. Farhan is a layperson. There's no way for him to know what the legal consequences might be of a plea. He's relying on counsel as he should and he was not advised. All right. Let me just see if there's any other questions. There's one more. I have a question I want to ask you. We're looking at this case now through the lens of what happened in 2017 and the... and all of the... generated by that. But once we get to the question of the ineffective assistance of counsel, we're confined to the period prior to the plea. Everything... That's the universe. That's the context in which the plea was taken and under those circumstances,   to the point where this is the kind of information that at that time counsel would be required to provide to counsel and to counsel would be required to provide to counsel and to counsel would be required to notify his client because of the fact that it was extremely rare. You know that as has been cited in a handful of cases really in the country. 150 cases over almost 40 years and very, very rare. And in addition to that,     He knew that his client was a naturalized citizen period. He didn't know that he was a naturalized citizen period. He didn't know that he was a naturalized citizen period. He didn't know anything about the context of that naturalization proceeding, the timing of it, what he might have said at the time, whether or not he had lied to the IRS officer, any of those things. And what's more, the ABA findings and I keep going back to that about consequences that need to be warned did not even include this at the time because it was so rare. Well, Your Honor, two points in response and I'll conclude. I mean, rarity simply does not enter into the Padilla analysis. Not once in Padilla does the Supreme Court look at whether the immigration consequences rare or not. That's simply not the analysis. I'm assuming your point, if we accept your point on Padilla and so that the Sixth Amendment means that it's not off the table. You're thinking, you passed the threshold, the Padilla threshold. You still have to show that Strickland was the one who passed it. Yes, Your Honor, and again, prevailing professional norms, I won't repeat the points about that. Your point about trial counsel not knowing, I'll cite some ABA standards for you from 1999, the criminal justice standards required counsel to be active, not passive. Again, all counsel had to do was to ask a question. In terms of actually listing all the consequences, the ABA didn't come up with denaturalization as a possibility and deportation was so indefinite to non-citizens. Respectfully, Your Honor, if he had gone and looked at the actual ABA 1999 standards, he could have come to the same conclusion. Well, Your Honor, the prevailing professional norms reflected in contemporaneous authority cited by the Supreme Court actually speak of    standards. In fact, in the past case law, there were no fewer than 87 civil denaturalization cases brought into five years preceding Mr. Farhan's plea. If trial counsel didn't know something, we think he should have known, but he was one question away from having all the knowledge he needed to properly advise his client and meet the constitutional standard. He really didn't have to say much because of lack of clarity in the law. He could have said something. You would agree that once we're in Strickland land, we're looking at 2006. Absolutely. I'm referring to contemporaneous record facts.  Padilla's plea was in what year? 2001. The Padilla decision came down in 2010. To your point, one last thing, of course the court should look at contemporaneous record facts. This court credited the 2255 affidavit. Mr. Farhan, this is 2010. The  Court decision was in 2010. Mr. Farhan's conviction became final after Padilla. In 2011. And the pleas were 2004 and 2006. I thought Padilla's plea was 2004. My apologies. I misstated that earlier.  you. We'll hear now from Mr. Metzner. May I please the court? The district court's denial of Mr. Farhan's 2255 motion should be affirmed for three different reasons. First, the sixth amendment does not extend to advice about the guilty plea because that is not a direct consequence of the plea. This court has long used the decision to deny the guilty plea. You were focusing on collateral estoppel. You never have to advise about the risk of denaturalization. What I'm saying is the obligation of defense counsel does not extend to the collateral usage in a subsequent proceeding of a guilty plea. That is what is going on here. If counsel knows that his client will be denaturalized by virtue of following as a consequence of a guilty plea to a criminal charge, he has no obligation to advise because the denaturalization is collateral. The sixth amendment  is collateral. There are a lot of different consequences. I realize but I'm asking you whether counsel never has a sixth amendment obligation to advise that denaturalization is a risk. That is correct. They have to advise about the direct consequences of a guilty plea. In the Padilla case itself, which is not the same as this one, what the court focused on was that the direct collateral distinction was not the best tool. What about misadvice about denaturalization? That is a completely different category. Misadvice about denaturalization is within the sixth amendment right. That is what Chavez said. Misadvice goes to  decision making of the defendant. Misadvice may have rendered ineffective assistance by convincing the defendant there was something that wasn't true. That is why those cases exist for years. When you talk about misadvice, you are talking about what was the advice rendered as part of the criminal defense by the lawyer and whether that was effective assistance of counsel or not. Just ask if it is within the collateral consequences of the plea with effect to denaturalization. Is it within the sixth amendment or not? Yes, you are. Misadvice about many issues, including the collateral consequences for losing law licenses for being subject to restraining orders, being subject to sexual exploitation  subject to restraining orders, there are non-crime based grounds for removal. If you are in the criminal context and pleading to a crime that is not grounds for removal, but in the course of that application, you would admit to conduct that would make you removable in a criminal        that is not grounds for removal, you would admit to conducting that removal proceeding. Does the sixth amendment apply with respect to that? Yes, they wanted to make sure they weren't going to deal with those outlying cases. Instead of being concerned about those scenarios, the occasional case where the conviction itself is not the basis for a deportation order, the vast majority of the serious criminal cases for non- citizens result in deportation solely because of the conviction itself. But even still, even if it's not a direct consequence because there might be uncertainty or lack of clarity, the sixth amendment requires counsel to give warning to that risk. Even though it's not automatic from the crime being applied to. It is almost always automatic. Rather than the conviction being the linkage between the conviction and deportation in the way the deportation statutes have now been developed, that it was appropriate to say that falls within the sixth amendment guarantee of effective assistance of counsel. And so let me ask Mr. Rowe to answer that question. I don't think that that is the case. I don't think that that is the case. I don't think that that is the case. I also  think that that is the case. I  not think that that is the case. I don't think that that is the case. I do not think that   case. I    is the case. I am not sure if we have any other questions. I am not sure if we have any other questions. I am not sure  we have any other questions. I am not sure if we have any other questions. Is that correct? I presume that this immigrant commits a crime that is not the subject for deportation. There is no connection between the criminal process and the immigration process. However, if someone is a nationalized citizen that commits a crime that can also serve as grounds for removal, then the immigration process or the status of the nationalized citizen who is committed a crime and the criminal process have some relationship to each other. I don't know that they do. It brings me to a point I would like to clarify. The removal has to be a separate proceeding. Right. But if Mr. Farnsworth committed a DWI or a driving while impaired, which is a misdemeanor in this case, if he committed driving while intoxicated, he couldn't be removed for it. The fact that his lawyer didn't know a hoop about his naturalization doesn't seem to be . It doesn't seem that that is a possibility. It doesn't, Your Honor. The linkage between the conviction itself and the resulting deportation is what the court found to be true. If you then become the grounds for removal, doesn't the criminal process in the immigration process inch closer towards becoming more Padilla-like again? Well, again, Your Honor, if you're talking about a non-citizen, of course it does under Padilla itself. Your hypothetical, I believe, posits a naturalized U.S. citizen. I'm just trying to understand how big a tenant Padilla is. Because what your brief says that this is Padilla plus, and you are both teeth, I'm saying that teeth   the same thing. So you should understand the argument that Padilla fits nicely around the immigration process. I'm trying to understand if Padilla teaches something. Is it applying Padilla to the circumstances or does Padilla answer all the questions? You are, it is absolutely a new rule for several reasons. First of all, Padilla itself used the word unique more than once in the opinion itself. About deportation? Yes, Your Honor. We've been focusing on here for some of us as deportation, the risk of deportation being heightened by the plea. Yes, there is an  step of denaturalization. If you focus on the deportation consequence, that was unique. That's why it was removed from the direct sentence. I would like to emphasize something here that I don't think was made clear by the defendant. Mr. Farhan's conviction is not sufficient to deport him if he becomes no longer a citizen. The reason is that he committed the offense while he was a citizen of the United States. The argument that an individual commits an aggravated felony after being denaturalized is denaturalized and now is subject to being deported under the aggravated felony provisions, two circuits have rejected that argument. The third circuit and the fourth  have rejected that argument. The idea that Mr. Farhan has an automatic ticket to deportability is not true. It is in fact true. When I was looking at the denaturalization complaint, I was struck by the number of times the government said that the court has no discretion in acting on this. The grounds for denaturalization are established. I know that there are defenses that have been preserved, but still that was the premise in proceeding. The Justice Department has advised us that the government does not seek denaturalization unless you intend to pursue deportation as well. Where are the holes in that chain of logic? The discretion that the government is talking about is that once the elements have been established for denaturalization, the court does need to enter an order of denaturalization. In each of the three counts, there are defenses that he has the opportunity to raise. Nothing about his conviction makes the court have to enter judgment against him for any of those three counts. All three have defenses he can raise. It is only once the government has established the basis for denaturalization that he becomes to his prior status as a permanent resident of the United States. A permanent resident  United States. As I said, in the Hilton case, those courts of appeals have said the government cannot rely on an aggravated felony while the person is a citizen who gets denaturalized to say you have been convicted of an aggravated felony. That is problematic. Isn't that still a severe risk? We don't know how other courts might decide that. The difference is the links in the chain are so substantial and attenuated from the original conviction that it doesn't have the connection that Padilla was insisting on. Padilla said the reason we are taking this out of the collateral distinction is because of the direct linkage between the conviction itself and the deportation. That is absent in this case. The denaturalization doesn't depend on the conviction itself. The government will argue and has argued that it does qualify. I don't want to undermine my colleagues. The fact is two courts have ruled that it is not good enough. The government is 0 for 2 on this particular argument. The argument is that he committed the conduct during the five-year period before he filed the application. That is correct. That is the basis for the denaturalization. The basis for a subsequent deportation would be the conviction for an aggravated felony. That was sustained after he was a citizen. We have talked a lot about the lawful permanent residence. We are talking about citizens and their risk of deportation. I want to talk a little bit about somebody who is here who is not a lawful permanent resident, not a citizen, but has asylum. Are they protected under the umbrella of the recognition involving the Sixth Amendment right to counsel and immigration advice about deportation? Absolutely. They are noncitizen. Padilla applies to any noncitizen. In the case of the SIL, the mechanism for deporting someone with asylum is that you first have to terminate their status as an SIL and then bring a separate removal petition. It is a process that looks remarkably parallel to denaturalization followed by removal. I am trying to figure out how it is different and why we would think that the noncitizen has greater rights under FARHAN than a citizen for whom it is the same two-step process of deportation with an equal level of likelihood flowing from the conviction. Respectfully, Your Honor, they don't have greater rights. They are simply different situations. The reason is that for a noncitizen the statute is operating. The lack of discretion on the part of the government to stop it, the lack of any real defense. If the government has to prove that you were convicted of a particularly serious crime and constitute a danger to the community of the person    of the crime, then the government has to bring a denaturalization petition. It is substantial and has been for more than 100 years. The way the discretion has been exercised in the past is a  example of the results of deportation from the country. The opinion itself talking about how the immigration laws have evolved to the point that once an individual is convicted of a sufficiently serious felony, the process for that person to be released automatically. That is, there is very little discretion in any aspect of the process along the way before that person who has simply been convicted without regard to the underlying facts of the conviction or anything else about the person but rather the conviction itself being the basis for that person      deportation from the country, the idea is to simply say those are the folks because of the connection between deportation and convictions, any person who is facing a noncitizen we are going to make sure that       what they need to do and we are going to make sure that we make the law the same when we make the law the same way it should be done. We are going  make     way it    We are going make the law the the   should be done. We same way it should   We are going make We are going  the law the same  done.   make the law the the law  the same  should be done. We are going make the  the same way it make the law the     done. We are going  the the same way it  be done. We are should be done.   make the law Thank you. We   the decision. That concludes the hearing. Thank you.